**IN THE UNITED STATES DISTRICT COURT**
**FOR THE NORTHERN DISTRICT OF ILLINOIS EASTERN DIVISION**

| | | |
|---|---|---|
| JOSH WATSON | ) | |
| | ) | No. 22 C 4106 |
| Plaintiff, | ) | |
| | ) | |
| vs. | ) | JURY DEMAND |
| | ) | |
| THE VILLAGE OF LYNWOOD, et al. | ) | Honorable Jeremy C. Daniel |
| | ) | |
| Defendants. | ) | |

**DEFENDANTS' COMBINED MOTION PURSUANT TO RULES 50(b) AND 59**

Defendants, the Village of Lynwood and Jada Curry, renew their request for judgment as a matter of law on Count I and Plaintiff's request for punitive damages pursuant to Rule 50(b). Defendants also move for a new trial or to alter or amend the judgment pursuant to Rule 59.

## ARGUMENT

### I. Defendants are entitled to judgment as a matter of law on Count I and on Plaintiff's request for punitive damages.

A. Legal Standard

Federal Rule of Civil Procedure 50(b) permits a party to file a renewed motion for judgment as a matter of law after a jury returns a verdict. In ruling on such a motion, the court may allow the verdict to stand, order a new trial, or direct entry of judgment as a matter of law. *Id*. A motion under Rule 50(b) is simply a means of renewing a previously filed motion under Rule 50(a).

B. Defendants are entitled to judgment as a matter of law on Count I.

Plaintiff contends that the Defendants retaliated against him in violation of his First Amendment Rights when it terminated his employment. Specifically, Plaintiff contends that he engaged in protected speech when he reported to the Illinois State Police that Mayor Curry

improperly requested and received LEADS information[1]. This report does not constitute protected speech as a matter of law, and Defendants are therefore entitled to judgment as a matter of law.

To establish a prima facie case of unlawful First Amendment retaliation, a public employee must establish that: (1) he engaged in constitutionally protected speech; (2) he suffered a deprivation likely to deter her from exercising her First Amendment rights; and (3) his speech was a motivating factor in her employer's adverse action. *Valentino v. Village of South Chicago Heights,* 575 F.3d 664, 670 (7th Cir. 2009). "[P]ublic employees have no cause of action for First Amendment retaliation unless they were disciplined for speaking *as citizens* about a matter of public concern." *Spiegla v. Hull*, 481 F.3d 961, 963 (7th Cir. 2007) (citing *Garcetti v. Ceballos*, 547 U.S. 410 (2006)). "When public employees make statements pursuant to their official duties, they are not speaking as citizens and the Constitution does not insulate their communications from employer discipline." *Id*. at 964 (citations and quotations omitted). Thus, the "threshold inquiry is whether the employee was speaking as a citizen; only then [does the court] inquire into the content of the speech." *Id*. at 965.

In *Garcetti,* a deputy district attorney filed First Amendment retaliation claiming he suffered adverse employment actions in retaliation for engaging in free speech. *Id.* at p. 415. There, the speech at issue was a disposition memorandum recommending dismissal of a case based on purported governmental misconduct. *Id.* at p. 414-415. The Supreme Court held that the plaintiff's expressions contained in the memorandum were made pursuant to his duties as a deputy prosecutor. *Id.* at p. 421. The Court further held that "the fact that Ceballos spoke as a prosecutor in fulfilling a responsibility to advise his supervisor about how to best proceed with a pending case

[1] Before closing arguments, Plaintiff withdrew his First Amendment Retaliation claim insofar as it was premised on Plaintiff's report to the Department of Labor, and Defendants therefore do not address it here.

distinguishes Ceballos' case from those in which the First Amendment provides protection against discipline." *Id.* The Court determined that

> "Ceballos did not act as a citizen when he went about conducting his daily professional activities, such as supervising attorneys, investigating charges, and preparing filings. In the same way he did not speak as a citizen by writing a memo that addressed the proper disposition of a pending criminal case. When he went to work and performed the tasks he was paid to perform, Ceballos acted as a government employee. The fact that his duties sometimes required him to speak or write does not mean his supervisors were prohibited from evaluating his performance." *Id.* at 422.

Accordingly, the Court held that plaintiff's speech was not protected by first Amendment. *Id.*

In *Spiegla*, a correctional officer reported a breach of prison security protocol pertaining to the searching of employee and visitor vehicles for contraband. *Id*. at 962-63. Four days later, the officer was reassigned to a worse shift. *Id*. at 963. The officer sued, asserting a first amendment retaliation claim. *Id*. Pursuant to the analysis in *Garcetti*, the 7th Circuit directed the District Court to enter judgment in favor of the Defendants. *Id*. at 966, 967. Specifically, the court reasoned that the plaintiff reported the incident to her supervisor "pursuant to her responsibility as a correctional officer to inform her superiors of a possible breach in prison search policy, especially one involving two senior prison officers." *Id*. at 966. "In doing so she spoke as an employee, not a citizen, because ensuring compliance with prison security policy was part of what she was employed to do." *Id*. The court reached this conclusion even though it determined that making a report of this nature was not one of her core functions. *Id*. The court reasoned that *Garcetti* does not require a job responsibility to be "core." *Id*. Rather, *Garcetti* asks "only whether an employee's expressions [were] made pursuant to official responsibilities." *Id*. (citations and quotations omitted).

In *Casey v. West Las Vegas Independent Sch. Dist.*, a school superintendent complained to the board of education about concerns she had regarding the district's legal compliance in its operation of a federally funded initiative for low-income children. 473 F.3d 1323, 1325-26 (10th

Cir. 2007) When her concerns were not addressed, she directed her subordinate to contact federal authorities regarding the district's non-compliance. *Id*. at 1326. The Superintendent was subsequently terminated by the board of education, and she filed a First Amendment retaliation claim. *Id*. at 1327. The 10th Circuit held that, under *Garcetti*, the report to federal authorities was made pursuant to her duties as the employee responsible for administering the program on behalf of the district, and was therefore not protected speech. *Id*. at 1330-31.

Here, the following evidence introduced at trial demonstrates that Mr. Watson's report to the Illinois State Police was made pursuant to his official responsibilities[2]:

- Plaintiff was the administrator of the "Spillman" system – i.e. the police department's records system.
- To access Spillman, and to act as the Spillman administrator, Plaintiff was required to be LEADS certified.
- Plaintiff was LEADS certified.
- Plaintiff was familiar with the LEADS security policy.
- Plaintiff had to be LEADS certified to perform his IT responsibilities pertaining to, *inter alia*, the LEADS and Spillman systems.
- Plaintiff was responsible for setting user access permissions for Village employees with respect to the LEADS database.
- Plaintiff was responsible for ensuring that only authorized users had access to the LEADS database.
- Plaintiff believed that Mayor Curry improperly accessed a LEADS background check.
- Plaintiff learned about Mayor Curry requesting and receiving a LEADS background check during his employment and before he went on FMLA leave.
- Plaintiff believed that Mayor Curry's conduct violated the LEADS security policy
- Plaintiff reported this purported unauthorized access to the Illinois State Police.

[2] Defendants have not yet received the final transcript of proceedings. Once the transcript is finalized, Defendants are happy to supplement this brief with record citations if the Court would find that helpful.

- Plaintiff continued to receive and respond to work questions while he was on FMLA in the days immediately prior to contacting the Illinois State Police.

This uncontested and unrebutted evidence establishes that Plaintiff had job responsibilities which were explicitly related to managing who at the Village had access to the LEADS database. Like the reports in *Casey* and *Spiegla*, Plaintiff's report to the State Police pertained to that duty as he reported the unauthorized access which he believed violated the LEADS Security Policy. The report to the Illinois State Police was made pursuant to his official job responsibilities relating to the management of user access to LEADS. Although Plaintiff was on FMLA leave at the time of the report, he continued to perform job functions while he was on leave. As a result, Plaintiff did not speak as a citizen when he made this report and Defendants are entitled to judgment as a matter of law on Count I and Plaintiff's request for punitive damages.

C. <u>Defendants are entitled to judgment as a matter of law on punitive damages.</u>

Punitive damages are designed "to punish the defendant for reprehensible conduct and to deter him and others from engaging in similar conduct." *Kemezy v. Peters*, 79 F. 3d 33, 34 (7th Cir. 1996). Such damages are permissible under §1983 when the plaintiff demonstrates that defendants displayed "reckless or callous disregard for the plaintiff's rights or an intentional violation of federal law". *Smith v. Wade,* 461 U.S. 30, 51 (1983). To award punitive damages, the jury must be presented with evidence that the defendant acted with "malice or reckless indifference" towards the plaintiff. *Kolstad v. American Dental Ass'n*, 527 U.S. 526, 538-540 (1999). There is a "positive element of conscious wrongdoing" that is required to demonstrate that the individual was aware that his action was in violation of federal law. *Id.* at 535-538.

Plaintiff cannot show that Mayor Curry acted with "malice or reckless indifference" or conscious wrongdoing. "The terms 'malice' or 'reckless indifference' pertain to the employer's knowledge that it may be acting in violation of federal law, not its awareness that it is engaging in

discrimination." *Kolstad* at 535. While it may be unnecessary to show actual malice, it does require a "subject consciousness" of injury or illegality and a "criminal indifference to civil obligations." *Id* at 536 (citations omitted). This is a high standard and "[t]here will be circumstances where intentional discrimination does not give rise to punitive damages liability under this standard." *Id.* This includes a situation where "the employer discriminates with the distinct belief that its discrimination is lawful." *Id.* Whether a defendant is subject to punitive damages should be characterized in terms of that defendant's motive or intent. "The justification of exemplary damages lies in the evil intent of the defendant." *Id.* at 538 (citations and quotations omitted). Plaintiff did not introduce any evidence demonstrating that Mayor Curry had a subject consciousness of injury or illegality or reckless indifference to her civil obligations. Defendants are therefore entitled to judgment as a matter of law on Plaintiff's request for punitive damages.

## II. Defendants are entitled to a new trial under Rule 59(a) because the jury heard extremely prejudicial inadmissible evidence.

### A. Legal Standard

A court may order a new trial under Rule 59(a) "if the jury's verdict is against the manifest weight of the evidence or if the trial was in some way unfair to the moving party." *Franco v. Richland Refrigerated Sols., LLC*, 128 F.4th 857, 864 (7th Cir. 2025) (quotations omitted).

### B. The Court improperly admitted propensity evidence regarding Mayor Curry's conduct towards Jocelyn Hooks in violation of Rule of Evidence 404(b).

The Jury returned a verdict against Defendants on three claims sounding in retaliation: (1) First Amendment Retaliation; (2) Illinois Whistleblower Act; and (3) FMLA Retaliation. In sum, the Jury determined that Mayor Curry (and therefore the Village) terminated Plaintiff in retaliation for him filing reports with the Illinois State Police and the U.S. Department of Labor. Throughout trial, multiple witnesses were permitted to testify about a purported retaliatory action which Mayor

Curry took against another Village employee – Jocelyn Hooks – only two months before Plaintiff was terminated. Moreover, the alleged retaliation against both Ms. Hooks and Plaintiff pertained to the Mayor's access to the same LEADS background check report. The evidence about the employment actions concerning Ms. Hooks should have been barred from evidence under Rule 404(b)(1), and its admission significantly impaired the trial's fairness.

Rule 404(b)(1) provides that "evidence of any other crime, wrong, or act is not admissible to prove a person's character in order to show that on a particular occasion the person acted in accordance with the character." Fed. R. Evid. 404(b)(1). To determine whether evidence is being used for an improper purpose under 404(b)(1) or a permissible non-propensity purpose under Rule 404(b)(2), "the court must consider the chain of logic by which the jury is being asked to glean the defendant's knowledge, intent, etc. from proof of his prior misdeeds." *U.S. v. Lee*, 724 F.3d 968, 977 (7th Cir. 2013). "Unless there is a persuasive and specific answer to that question…then the real answer is almost certainly that the evidence is probative only of propensity." *Id* (quoting *U.S. v. Miller*, 673 F.3d 688, 699 (7th Cir. 2012)). When improper propensity evidence is admitted, the Court analyzes "whether an average juror would find the prosecution's case significantly less persuasive without the improper evidence." *Miller*, 673 F.3d at 700.

Here, Plaintiff solicited testimony and offered evidence which was used to establish that in January 2022 – two months before Plaintiff was purportedly fired for reporting Mayor Curry to the Illinois State Police for improperly accessing a LEADS background check – Mayor Curry demoted Jocelyn Hooks, took her office away, and forced her to work on nights after Ms. Hooks initially refused to provide Mayor Curry with the LEADS background check. Plaintiff argued that this evidence was not offered for propensity purposes, and was instead offered to establish Plaintiff's state of mind and to explain why he made the report to the Illinois State Police. The

problem with Plaintiff's argument, of course, is that his knowledge of Mayor Curry's improper access to LEADS background check information does not rely on his knowledge of the subsequent retaliatory employment actions which Ms. Hooks purportedly suffered.

At trial, Plaintiff testified that he spoke with Ms. Hooks on January 20, 2022. During that conversation, Ms. Hooks informed him that she had been asked to disseminate LEADS background check information to the Mayor, that she refused to provide it, and that she felt she was in trouble for it. This conversation occurred before Ms. Hooks was subsequently informed on January 21, 2022 about the changes to her title, office, and work schedule. In other words, the knowledge Plaintiff required to make his report to the Illinois State Police was obtained <u>before</u> he had knowledge of any purported retaliation against Ms. Hooks. Consequently, the testimony and evidence regarding the subsequent actions taken against Ms. Hooks after her argument with Mayor Curry serve no purpose other than to establish a propensity to retaliate.

Furthermore, the Plaintiff's case would be significantly less persuasive without this evidence. The Plaintiff's were able to introduce testimony from multiple witnesses and Plaintiff's Exhibits 223 and 225 over Defendants' objection regarding the purported retaliation which Ms. Hooks suffered. This evidence was not needed to establish Plaintiff's knowledge that Mayor Curry requested and ultimately received a LEADS background check, and served no purpose other than to establish a propensity to retaliate. A reasonable juror would find Plaintiff's case significantly less persuasive without this evidence. Due to the improper admission of this propensity evidence, the Defendants did not receive a fair trial and are entitled to a new trial under Rule 59(a).

C. <u>The Court improperly admitted evidence regarding the Defendants offer of a severance agreement with a release of claims in violation of Rule of Evidence 408.</u>

Plaintiff solicited testimony from multiple witnesses and introduced documentary evidence [Pl. Exs. 250, 251, 253, 254, 263] which established that, after Mayor Curry informed Plaintiff

that his position was being eliminated, the Defendants offered him an agreement containing a release of claims. The Court erred when it admitted this evidence.

Under Rule 408, a party's offer of "valuable consideration in compromising or attempting to compromise the claim" is not admissible to "prove or disprove the validity or amount of a disputed claim[.]" Fed. R. Evid. 408(a)(1). Here the evidence shows that the Defendants informed Plaintiff that his job was being eliminated and that it then offered him a severance agreement under which it offered to pay Plaintiff two months' salary in return for him executing an agreement containing a release of claims. [Pl. Ex. 253.] Throughout trial, Defendants' objected to the introduction of testimony and exhibits relating to this settlement offer as it served no purpose other than to establish Defendants' liability on Plaintiff's claims.

At the conclusion of witness testimony on the third day of trial, the Court explained its rationale for permitting the proffered testimony and exhibits into evidence. Specifically, the Court indicated that the claim had not accrued yet at the time of the offer. In support of this reasoning, the Court relied on the Seventh Circuit's rulings in *Wine & Canvas Dev., LLC v. Muylle*, 868 F.3d 534 (7th Cir. 2017) and *United Mine Workers v. Brushy Creek Coal Co.*, 505 F.3d 764 (7th Cir. 2007). These cases are distinguishable and do not support the conclusion that the Defendants' settlement offer was admissible here.

In *Wine & Canvas*, the Court admitted testimony that, during a settlement conference pertaining to the plaintiff's claims, the plaintiff told the defendant that his goal was to close the defendant's business or that his attorney would close it for him. 868 F.3d at 540, 541. After this settlement conference, the Defendant filed a counterclaim for abuse of process. *Id*. at 541. The Seventh Circuit concluded that the testimony was permissible. *Id*. at 540-41. It reasoned that the testimony was not offered to prove liability on Plaintiff's claim; rather, it was offered "to show

Plaintiffs' improper intent and ulterior motive in filing their lawsuit for the purpose of proving [defendant's] abuse of process counterclaim." *Id*. at 540. The Court further cautioned that its holding was limited to the facts of this case which were not likely to arise in other cases. *Id*. at 541. That is because unlike the facts in *Wine & Canvas*, "settlement discussions usually encompass multiple claims all at once" as opposed to only one of the claims at issue. *Id*. Here, the Defendants offered Plaintiff a severance payment in return for him signing a release agreement immediately after it informed him that his position had been eliminated. Plaintiff claims that the elimination of his position was pretext for the alleged retaliatory termination underpinning all three of his claims. Simply put, the severance agreement was unquestionably an offer to compromise the claims Plaintiff might bring as a result of the elimination of his position and termination.

*Brushy Creek Coal* is also distinguishable. There, the plaintiff mine workers sued their former employer for reducing health benefits which the plaintiffs contended they were entitled to on a lifetime basis pursuant to the applicable collective bargaining agreement. 55 F.3d at 766. In turn, the defendant employer argued it was entitled to unilaterally reduce the benefits under the applicant health plan. *Id*. at 766-67. Prior to reducing the benefits, the defendant made cash offers to the plaintiffs "in lieu of the lifetime benefits provided pursuant to the collective bargaining agreement." *Id*. The Court held these offers were not inadmissible under Rule 408 because they were offered before the company exercised its right to modify the plan. *Id*. at 768. In other words, it was offered to head off litigation before the conduct which might invite litigation had occurred.

The timing issue present in *Brushy Creek Coal* is not present here. That is because the offer was made after the Defendants informed Plaintiff that his position was eliminated. Consequently, the predicate acts to support Plaintiff's claims had already occurred when the settlement offer was made. What's more, this offer occurred in the context of a discussion which multiple witnesses

testified included a back and forth regarding the Plaintiff's report to the Illinois State Police. Plaintiff testified that he felt he was being terminated for making that report, indicating that, at the time the Defendants made the offer, he already held a belief that he was being wrongfully terminated. Simply put, the timing issue raised by the Court at trial is not present here. Plaintiff's claims had accrued at the time the Village offered the release agreement, and this offer should not have been admitted into evidence. Finally, its introduction into evidence would significantly impact the jurors' assessment of the strength of Plaintiff's claims given that the evidence was offered to establish Defendants' liability. The Defendants did not receive a fair trial as a result and should receive a new trial pursuant to Rule 59(a).

D. The Court improperly admitted attorney-client privileged emails and documents.

Defendants, through their prior attorney Eric Grodsky, inadvertently produced attorney-client privileged emails.[3] The Defendants took prompt action to claw the emails back after discovery of the inadvertent production, and filed Motion in Limine #5 ("MIL 5"), seeking to exclude reference to those attorney-client privileged emails at trial. [Dkt. 78]. On September 1, 2026, the Court issued a ruling denying MIL 5. [Dkt. 104.] In doing so, it held that the subject email was privileged, inadvertently disclosed and Defendant took prompt steps to rectify the inadvertent disclosure. [*Id*.]. However, the Court disagreed that Defendants took reasonable steps to prevent disclosure by taking a "casual, produce-first, review-later approach" and thus denied MIL 5. [*Id*. at p. 4] The email was admitted at trial as Plaintiff's Exhibit #265.

Under F.R.E. 502, "disclosure of privileged information will not operate as a waiver when (1) the disclosure is inadvertent; (2) the holder of the privilege or protection took reasonable steps to prevent disclosure; and (3) the holder promptly took reasonable steps to rectify the error,

[3] Defendants acknowledge that additional privileged emails were inadvertently produced, but only one email thread was relevant to the subject lawsuit and at issue in this case. [Dkt. 78-1; *see also* Pl. Ex. 265.]

including (if applicable) following F.R.C.P. 26(b)(5)(B). C*armody v. Bd. of Trustees of Univ. of Ill,* 893 F.3d 397, 406 (7th Cir. 2018). In evaluating whether a party took reasonable efforts to prevent disclosure, Courts will look at the number of documents reviewed and the time constraints for production. *Wier vs. Untied Airlines, Inc.* 2021 WL 1517975 at *13 (N.D.Ill 2021).

In *Carmody,* the District Court inferred that the defendant's review procedures were reasonable, albeit imperfect, and credited the defendant's representations that it took steps to review the documents for privilege. *Id.* at 406. The 7th Circuit held that the defendant's lawyer's "oversight was surely a doozey, but the point of Rule 502(b) is to protect client's confidences from their lawyers' human errors like this one." *Id.*

Attorney Grodsky took reasonable steps to remove attorney-client privileged emails, and there is no evidence to suggest otherwise. The Village produced tens of thousands of emails, which had to be reviewed for responsiveness and privileged materials. [Dkt. 78-4]. As indicated in Attorney Grodsky's affidavit, once he identified an attorney-client privileged email after personally viewing each email, as opposed to using a software system to review the emails, he moved it to a deleted folder for the purpose of permanently removing that email from the production. *Id.* After the email file had been properly deleted, Attorney Grodsky exported the responsive emails in the form of a new .PST file, which were then saved and ultimately transmitted to Plaintiff. *Id.* It is unknown how the emails were disclosed. While attorney Grodsky's review procedures were imperfect, and the mistake surely a "doozey", his affidavit confirms that he personally reviewed the emails for privileges and the inadvertent production was clearly an error.

## III. The Court should alter or amend the Jury's $250,000 verdict because it is not commensurate with the evidence admitted at trial regarding Plaintiff's damages.

Trial Courts have considerable discretion when ruling on a Rule 59(e) motion to alter or amend an award. See *Medcom Holding Co. v. Baxter Travenol Labs, Inc.*, 106 F.3d 1388, 1397

(7th Cir. 1997) (noting that the trial court is held to an abuse of discretion standard and deference is given to the court's ruling on such motion). When reviewing a jury's damages award, the trial court may reduce or vacate the damages if the award is (1) monstrously excessive, (2) lacks a rational connection to the evidence, indicating that the award is a product of the jury's "fevered imaginings or personnel vendettas", or (3) is not roughly comparable to awards in similar cases. *Adams v. City of Chi.*, 798 F.3d 539, 543 (7th Cir. 2015). The Seventh Circuit has noted that the "monstrously excessive" inquiry may be construed as another means of asking whether the award had a rational connection to the evidence. *Id*.

Compensatory damages are designed to make a party whole. *Douglass v. Hustler Magazine, Inc.*, 769 F.2d 1128, 1146 (7th Cir. 1985). A trial court has the duty to ensure that a jury verdict is supported by competent evidence. *Ramsey v. Am. Air Filter Co., Inc.*, 772 F.2d 1303, 1313 (7th Cir. 1985). Moreover, only concrete, proven losses resulting from a culpable defendant's conduct should be reflected in a jury's verdict. *Cooper Indus., Inc. v. Leatherman Tool Group, Inc.*, 532 U.S. 424, 432 (2003). Here, there is no rational connection between the award and the evidence presented at trial.

In Jury Instruction 26, the Court instructed the Jury that it "may award compensatory damages only for injuries that the plaintiff has proved by a preponderance of the evidence were caused by the defendants' wrongful conduct." Plaintiff did not call any therapists or medical treaters at trial, and there was no medical testimony of any kind which would support a conclusion that Plaintiff's purported emotional distress was caused by the Defendants' actions. While medical testimony is not mandatory, the lack of such testimony is particularly salient here where the undisputed evidence is that Plaintiff had over a decade's worth of continuous treatment for significant preexisting mental health conditions prior to his termination at the Village of Lynwood.

In particular, Plaintiff admitted to the following regarding his preexisting mental health struggles:

- He has treated for anxiety since at least April 2010.
- He was diagnosed with adjustment disorder with mixed anxiety and depressed mood in April 2010.
- He was diagnosed with panic attacks in April 2010.
- He has received mental health treatment since April 2010.
- He started taking Xanax in 2017 for anxiety.
- He was again diagnosed with depression in 2018, and sought continued treatment for it.
- Plaintiff began treating for PTSD in 2018.
- Throughout his mental health treatment for years prior to his termination in March 2022, he reported stressors causing his anxiety relating to work, family, his childhood, and finances.
- He sought treatment for suicidal thoughts in February 2021.
- In December 2021 – four months before his termination – Plaintiff's primary care provider recommended that he attend counseling every two weeks for anxiety and panic attacks.

At trial, Plaintiff chiefly complained that he has suffered emotional distress from Defendants' actions because he (1) has to respond to questions from friends and family members about this lawsuit, (2) had concerns about his medical insurance and ability to provide for his family after his termination, (3) continues to feel closed off from his family, and (4) has concerns about getting fired from his current job in the future. However, his own testimony demonstrates that these stressors were not caused by Defendants' conduct.

Plaintiff expressed anxiety relating to financial and family struggles for years prior to his termination. His concerns about an ability to provide for his family and feeling closed off from his family were not new. Moreover, the evidence demonstrates that Plaintiff had treated continuously for his mental health issues, including in the months immediately preceding his termination.

Consequently, the Jury could not infer from a (nonexistent) break and resumption in treatment that his termination somehow exacerbated or aggravated his preexisting mental health struggles.

His complaint that responding to questions about the pendency of this lawsuit caused him distress is similarly unavailing. Plaintiff's damages must be tied to Defendants' conduct – i.e. his termination – not to his subsequent choice to engage in federal litigation over that decision. Moreover, his concerns about getting fired from his current job are not supported by the evidence. He has been consistently employed since July 2022. During that time, he has received multiple promotions and raises, and is currently making nearly $40,000 more per year than he was when he worked for the Village of Lynwood. Plaintiff may have been distressed about his finances during his four-month period of unemployment. But it is inconceivable that, after he was hired at a higher salary than he received in Lynwood, and after he received multiple raises and promotions, he suffered such significant emotional distress relating to finances or job stability.

Simply put, there was insufficient evidence to establish that his mental health was significantly altered as a result of Defendants' conduct. There is no rational connection between the evidence introduced at trial and the $250,000 award issued by the Jury. For these reasons, the Jury's award should be significantly reduced. Plaintiff should be given the option to accept remittitur of the jury verdict or a new trial.

## CONCLUSION

For the foregoing reasons, Defendants request that the Court: (a) grant them judgment as a matter of law on Count I or, in the alternative, grant them judgment as a matter of law on Plaintiff's request for punitive damages; (b) grant them a new jury trial; (c) in the alternative, amend or alter the judgment in this case; and (d) grant such other relief as it deems just and fair.

Respectfully submitted,

THE VILLAGE OF LYNWOOD and JADA CURRY

By: /s/ Eric B. Bernard
One of Their Attorneys

Jennifer K. Schwendener
Eric B. Bernard
PETRARCA, GLEASON,
BOYLE & IZZO, LLC
5100 Main St., Ste. 201
Downers Grove, IL 60515
630-796-2086
jschwendener@petrarcagleason.com
ebernard@petrarcagleason.com